**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**CIVIL NO. 3:04CV530-H**

| | | |
|---|---|---|
| **WILLIE LEGGETTE and BIO-MEDICAL APPLICATIONS OF NORTH CAROLINA, INC., d/b/a/ BMA OF ALBEMARLE as ASSIGNEE OF WILLIE LEGGETTE,** | ) ) ) ) | |
| | ) | |
| **Plaintiffs,** | ) ) | |
| | ) | |
| **vs.** | ) | **MEMORANDUM AND ORDER** |
| | ) | |
| **B.V. HEDRICK GRAVEL & SAND COMPANY, a North Carolina corporation, and THE HEDRICK EMPLOYEE GROUP BENEFIT PLAN 1, and ERISA-governed Employee Benefit Plan, and PRIMARY PHYSICIANCARE, INC., a North Carolina corporation,** | ) ) ) ) ) ) ) ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

    **THIS MATTER** is before the Court on the following motions and memoranda:

    1. Defendant Primary Physiciancare Inc.'s "Motion to Dismiss or, in the Alternative, for Summary Judgment" (document #39) and "Memorandum ... in Support [with attached exhibits]" (document #40), both filed March 9, 2006;

    2. "Plaintiffs' Motion for Summary Judgment" (document #44) and "Memorandum ... in Support [with attached exhibits]" (document #45), both filed March 31, 2006;

    3. "Defendants B.V. Hedrick Gravel and Sand Company and Hedrick Employee Group Benefit Plan 1's Motion for Summary Judgment" (document #46) and "Memorandum ... in Support [with attached exhibits]" (document #47), both filed March 31, 2006;

    4. "Plaintiffs' Motion to Strike the Declaration of Joanne Johnson" (document #51) and "Memorandum ... in Support" (document #52), both filed April 17, 2006;

5.  "Plaintiffs' Response ... to Hedrick Defendants' Motion for Summary Judgment" (document #53) filed April 17, 2006;

6.  Hedrick Defendants' "Response ... to Plaintiffs' Motion for Summary Judgment" (document #54) filed April 17, 2006;

7.  "Plaintiffs' Reply ... [in support of] Motion for Summary Judgment" (document #58) filed April 24, 2006;

8.  "Defendants' Response to Plaintiffs' Motion to Strike ... " (document #63) filed May 4, 2006;

9.  "Defendants' Reply ... [in support of] Motion for Summary Judgment" (document #64) filed May 8, 2006; and

10. "Plaintiffs' Reply ... [in support of] Motion to Strike ... " (document #65) filed May 15, 2006.

The parties have consented to Magistrate Judge jurisdiction under 28 U.S.C. § 636(c), and these Motions are now ripe for determination.

Having carefully considered the parties' arguments, the record, and the applicable authority, the undersigned will <u>deny</u> the Plaintiffs' Motion to Strike and <u>grant in part</u> and <u>deny in part</u> the parties' cross Motions for Summary Judgment, as discussed below.

## I. <u>FACTUAL AND PROCEDURAL HISTORY</u>

This is an action to recover health insurance benefits, damages, and attorneys' fees pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001, and the Medicare Secondary Payor Act, 42 U.S.C. § 1395y ("MSP").

On March 15, 1999, the individual Plaintiff Willie Leggette was hired by Defendant B.V.

Hedrick Gravel & Sand Company ("Hedrick") and soon thereafter became a participant in Hedrick's self-funded Employee Group Benefit Plan 1 ("the Plan"), including the Plan's medical and health benefits.   Mr. Hedrick was given a copy of the Plan document.   Under the terms of the Plan, "out of network" charges were reimbursable at a 60% rate rather than the customary 80% for "preferred" or "in network" charges, and "out of network" charges by a hospital were subject to a $150,000 lifetime maximum.   The lifetime maximum for other charges, that is, "in network" by any provider and "out of network" by any provider other than a hospital, was $1 million.  In order to be eligible for payment, claims were required to be submitted within  12 months of the date of service.

The Plan defined "hospital" as follows:

> an institution is a hospital if it fully meets every one of the following tests: A. it maintains on the premises, on an inpatient basis, diagnostic and therapeutic facilities for surgical and medical diagnosis and treatment of sick and injured persons, by or under the supervision of a staff of duly qualified physicians; and B. it continually provides on the premises 24 hours a day registered graduate nurse (R.N.) services; and C. it is recognized as a hospital by the Joint Commission on Accreditation of Hospitals; and D. it makes charges for its services.

The Plan also had a paragraph captioned "ASSIGNMENTS" stating that the "Plan will pay any benefits accruing under this Plan to the employee unless employee assigns the benefits to a hospital, physician, or other provider or service furnishing the service.  No assignment, however, shall be binding on the Plan or Plan Supervisor."

Hedrick served as Plan Administrator, that is, Hedrick had the final authority and discretion concerning the Plan to determine whether the medical treatment discussed below was "in network" or "out of network," and whether the treatment facility, Plaintiff Bio-Medical Applications of North Carolina, Inc. ("BMA"), was a "hospital" under the terms of the Plan.  However, Hedrick retained Defendant Primary Physiciancare, Inc. ("PPI") to serve as "Plan Supervisor" to oversee the Plan's

day-to-day operations, which included making initial coverage decisions. The Plan further provided that if a beneficiary was dissatisfied with either PPI's or Hedrick's decisions regarding coverage issues, he or she had 60 days from notification of the contested decision to file an administrative appeal.

Taking the facts in the light most favorable to the Defendants, on November 1, 2000, Mr. Leggette, who suffers from End Stage Renal Disease ("ESRD"), became unable to work, but under ERISA, as amended by the Consolidated Budget Reconciliation Act of 1985 ("COBRA"), was eligible to continue his health insurance coverage through April 30, 2002, so long as he paid the monthly premiums. Mr. Leggette made premium payments only through February 2002, however, and his COBRA coverage lapsed on March 31, 2002.[1] Due to his ESRD, Mr. Leggette had Medicare coverage prior to November 1, 2000, and presently remains a Medicare participant.

On November 21, 2000, Mr. Leggette began receiving dialysis treatments (three treatments per week, each lasting five to six hours) at BMA's Albemarle, North Carolina facility, the only dialysis clinic within a 50 mile radius of his home. Initially there was confusion as to whether the Plan or Medicare was the party with primary responsibility to pay for Mr. Leggette's dialysis treatments, but the parties agree that the issue was soon resolved and that the Plan was, in fact, the primary payer. It is undisputed, however, that the Defendants did not have a contract with BMA or any other provider of dialysis services in North Carolina, that is, there was no "in network provider" of the dialysis treatments that Mr. Leggette required.

Although Mr. Leggette did not formally assign his rights to Plan benefits to BMA until later,

---

[1]After his condition evidently improved, Mr. Leggette was rehired on a part-time basis in March 2001, and on January 20, 2002, returned to full-time work, but was "laid off" prior to becoming eligible for reinstatement of his employee benefits. The Plaintiffs do not presently contend that the subsequent "lay off" was related to Mr. Leggette's medical condition or the subject dispute concerning his dialysis treatments.

BMA filed claims for reimbursement directly with the Plan.    At no time prior to the commencement of this litigation did PPI, Hedrick or the Plan object to dealing directly with or to making payments to BMA, which also acted, without objection from the Defendants, on Mr. Leggette's behalf concerning the subsequent administrative appeals discussed below.[2]

BMA submitted claims to the Defendants on forms known as "UB-92s," which the Defendants now contend are "typically" used by hospitals seeking reimbursement from insurance companies.  It is undisputed, however, that providers other than hospitals also use form UB-92, and that BMA used that particular form at PPI's suggestion.  Additionally, each UB-92 prepared and submitted by BMA contained the designation "721" in the "type of bill code" box, the "7" signifying that the provider was a "clinic," the "2" indicating that the clinic was an "independent dialysis center," and the "1" indicating that the claim was for an individual date of service (rather than a claim for services on several different dates).

Nevertheless, although the record does not disclose the basis for the determination, PPI concluded, at least initially, that BMA was an "out of network hospital" and, therefore, Hedrick reimbursed BMA only at the 60% out of network rate, and also applied the $150,000 maximum to BMA's charges.   Beginning sometime in August 2001, and along with Hedrick's benefit checks, PPI began mailing "Explanation of Benefit" statements ("EOBs") to BMA indicating both the rate of reimbursement and cap on benefits for the treatment Mr. Leggette was receiving from BMA. Some of the EOBs noted that Medicare was the secondary payer on Mr. Leggette's dialysis treatments.   There is no indication in the record that PPI ever sent similar notices to Mr. Leggette.

On September 17, 2001, BMA wrote PPI, pointing out that BMA's Albemarle facility was

---

[2]As the Plaintiffs point out in their briefs, such an arrangement is common and to require medical patients to do otherwise, that is, to serve as intermediaries between their medical providers and insurer, would "invite chaos."

the only dialysis clinic within 50 miles of Mr. Leggette's home and that BMA was not a hospital, and contending that the 80 % "in network" rate of reimbursement should apply, and that the $150,000 cap was inapplicable.

In the administrative record, an apparently undated document entitled "Repricing Appeal" completed by "Tami [last name unknown]" noted that "Robert [last name unknown]" verified that there were no in network kidney dialysis centers in the area; and that Tami "usually allow[ed] [in network] benefit[s] But this will be on-going- - Can we arrange for discounting?" The request was addressed by Tami's superior (name unknown) as follows: "PER HEATHER [last name unknown] WE DO NOT EVER PAY THIS FACILITY [in network]. MEMBER HAS [other insurance] ANYWAY TO FILE AS SECONDARY. APPEAL DENIED" (Capitalization in original).

In a "Request For Medical Review" form completed by Tami on October 8, 2001, she stated that there were no in network dialysis providers in the area and inquired as to whether the in network rate should apply under the circumstances. The response she received from "Heather" stated "[n]ever pay as [in network] - he has [other insurance] which he can file." There were, however, no citations to any provisions of the Plan supporting these determinations.

On October 20, 2001, PPI responded to BMA with what the Defendants now characterize as a "courtesy letter," but which actually was entitled "Response to Appeal," and which stated generally that BMA's claims had been processed correctly and again noted that Mr. Leggette had secondary Medicare coverage. Despite federal regulations requiring such a notice to specifically inform BMA and Mr. Leggette of their right to appeal directly to Hedrick, and the procedure and deadline for making such an appeal, the notice made no mention of the Plaintiffs' right to appeal, and Mr. Leggette was not mailed a copy.

Upon learning of the Plan's response from BMA, Mr. Leggette submitted an appeal to the Insurance Commissioner of North Carolina requesting assistance and expressing his "great concern" that the Plan was not covering its full share. The Department of Insurance contacted PPI, which in a November 29, 2001 letter responded that it was "an ERISA plan and the claims were processed correctly under the plan guidelines," but did not address any specific reasons for its actions or cite any Plan language to justify its denial.

The Defendants contend that on November 8, 2001, Mr. Leggette reached the $150,000 maximum for an out of network hospital, and effective that date, the Plan ceased paying any of BMA's claims.[3]

On April 10, 2002, BMA again wrote PPI, requesting that all of Mr. Leggette's treatment be reprocessed as in network, that is, subject neither to the reduced rate of reimbursement nor the $150,000 maximum.

On April 15, 2002, in a letter again entitled "Response to Appeal," PPI responded generally that the disputed claims had been processed correctly, that BMA should file those claims with Medicare, and that some unspecified claims had been made more than twelve months after the relevant date of service. This letter also made no mention of any further appeals procedure or a deadline for making such an appeal. Moreover, PPI's administrative record contains a handwritten note, authored by an unknown PPI employee in response to BMA's April 10 letter, acknowledging that BMA was a "kidney dialysis center and not a hospital," and stating that the Plan "should allow 'in network' maximum benefits - because no dialysis facilities [sic] is in network."

---

[3]Through that date, the Plan paid BMA $88,971.45. The remainder of the $150,000 out of network hospital maximum, $61,028.55, had been paid earlier to out of network hospitals that had provided Mr. Leggette unrelated services.

It is undisputed that BMA continued to contact PPI telephonically requesting further payments. In its present briefs, Hedrick contends that it had no knowledge of PPI's initial decision to deny further benefits until sometime after PPI received BMA's May 15, 2003 letter, discussed below. However, on August 9, 2002, Hedrick wrote BMA that there would be no further payments from the Plan which only "cover[ed] $150,000.00 maximum for a non-preferred hospital – we have met that please do no re-bill us."[4]

BMA continued to make telephonic requests in the interim, and on May 15, 2003, made its final written request that Mr. Leggette's claims be reprocessed as "in network."

On June 4, 2003, PPI sent BMA its "**FINAL APPEAL RESPONSE**" (emphasis in original), which again generally stated that the claims had been processed correctly and that the unpaid claims should be submitted to Medicare.

Sometime thereafter, PPI forwarded BMA's April 10, 2002 and May 15, 2003 letters to Hedrick, categorizing the documents as an administrative appeal. In the light most favorable to the Defendants, shortly thereafter, Joanne Johnson, the Hedrick employee charged with making decisions related to the Plan, determined that because the Plaintiffs had not appealed PPI's April 15, 2002 decision within 60 days, Hedrick had no discretion to review the denied claims.

On October 21, 2003, which in the light most favorable to the Defendants was "several months" after Ms. Johnson decided that the subject claims were unreviewable, she received a letter from PPI's attorney, Anna M. Flynn of the law firm Moore and Van Allen, PLLC, in which PPI completely reversed its earlier decisions. Indeed, Ms. Flynn informed Ms. Johnson that treating Mr. Leggette's claims as out of network and characterizing BMA as a hospital "would be arbitrary and

---

[4]Hedrick produced a copy of the letter in its Rule 26(a) Initial Disclosures.

capricious."  Ms. Flynn stated that BMA did not meet the Plan's definition of a "hospital," quoted above, and, therefore, the $150,000 maximum did not apply.  Ms. Flynn concluded that in the absence of the Plan having any in network dialysis provider, certain terms of the Plan (which are not identified in the record) mandated that BMA's charges be treated as in network and paid at the 80% rate.

The Plaintiffs contend that the total outstanding balance for Mr. Leggette's dialysis treatment, including co-payments that would be his responsibility in any event, is $276,386.54.  It is undisputed that none of these charges have been submitted to or paid by Medicare, nor is there any indication in the record at what rate Medicare would pay these charges.

On April 6, 2004, Mr. Leggette executed an "Assignment," formally assigning his rights to the disputed health benefits to BMA.

On October 14, 2004, the Plaintiffs filed their Complaint stating an ERISA claim for denial of benefits against each Defendant and an ERISA breach of fiduciary duty claim against PPI, as well as a claim against Hedrick and the Plan for violation of the Medicare Secondary Payers Act.

On March 9, 2006, and following the close of discovery, PPI filed its "Motion to Dismiss or, in the Alternative, for Summary Judgment," contending that because it did not have final authority to make coverage decisions, and the Plaintiffs have adequate avenues of relief as to both Hedrick and the Plan, PPI is not a proper Defendant in this action.  The Plaintiffs have not filed a response to this Motion, and Plaintiffs' counsel has informed chambers' staff telephonically that the Plaintiffs do not oppose PPI's Motion, which will accordingly be granted.

On March 31, 2006, the Plaintiffs filed their Motion for Summary Judgment as to their ERISA and MSP claims against Hedrick and the Plan.

The same day, the Hedrick Defendants filed their Motion for Summary Judgment, contending that Hedrick's decision to deny benefits was reasonable in light of PPI's initial decision to deny further coverage and the Plaintiffs' alleged failure to timely file an administrative appeal, and also asserting that BMA lacks standing to assert Mr. Leggette's claims. In support of their Motion, Hedrick and the Plan submitted Ms. Johnson's Declaration, in which she speculates that the fact that the disputed claims were initially submitted on UB-92 forms could have lead PPI to believe that BMA was a hospital.

On April 17, 2005, the Plaintiffs filed their Motion to Strike Ms. Johnson's Declaration, contending that the Declaration amounts to an attempt to make a <u>post hac</u> argument to justify the Defendants' actions. Although neither Ms. Johnson's Declaration nor the Defendants' other evidence is sufficient to create an issue of material fact in their favor on the Plaintiffs' ERISA denial of benefits claim, the undersigned has considered all of the parties' evidence and, accordingly, the Plaintiffs' Motion to Strike will be <u>denied</u>.

The Plaintiffs' and Defendants Hedrick's and the Plan's cross Motions for Summary Judgment have been briefed as set forth above and are, therefore, ripe for determination.

## II. <u>DISCUSSION</u>

### A. <u>Standard of Review</u>

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment should be granted when the pleadings, responses to discovery, and the record reveal that "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." <u>See also</u> <u>Charbonnages de France v. Smith</u>, 597 F.2d 406, 414 (4th Cir. 1979). Once the movant has met its

burden, the non-moving party must come forward with specific facts demonstrating a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). However, the party opposing summary judgment may not rest upon mere allegations or denials and, in any event, a "mere scintilla of evidence" is insufficient to overcome summary judgment. Id. at 249-50.

When considering summary judgment motions, courts must view the facts and the inferences therefrom in the light most favorable to the party opposing the motion. Id. at 255; Miltier v. Beorn, 896 F.2d 848, 850 (4th Cir. 1990); Cole v. Cole, 633 F.2d 1083, 1089 (4th Cir. 1980). Indeed, summary judgment is only proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there [being] no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotations omitted).

### B. ERISA Claim for Unpaid Benefits

#### 1. Assignment of Health Insurance Benefits

The Hedrick Defendants contend that the final sentence in the "ASSIGNMENTS" section of the Plan document amounted to an anti-assignment provision that precluded Mr. Leggette from assigning his health benefits to BMA. As quoted above, the Plan document stated that the "Plan will pay any benefits accruing under this Plan to the employee unless employee assigns the benefits to a hospital, physician, or other provider or service furnishing the service. No assignment, however, shall be binding on the Plan or Plan Supervisor."

There is no published Fourth Circuit authority on point; however, the majority of courts

considering the issue have held that in the absence of a valid anti-assignment provision in the ERISA plan document, when an insured patient assigns his health care benefits to a healthcare provider, the provider has standing to enforce the Plaintiff's rights in any subsequent ERISA action. See, e.g., HCA Health Services of Georgia, Inc. v. Employers Health Ins. Co., 240 F.3d 982, 991 (11th Cir. 2001) (health care provider assignee had standing under ERISA to sue for recovery of health benefits); Hermann Hosp. v. MEBA Medical & Ben. Plan, 959 F.2d 569, 574 (5th Cir. 1992) (same); Arkansas Blue Cross & Blue Shield v St. Mary's Hosp., Inc., 947 F2d 1341, 1351 (8th Cir. 1991) (same); Kennedy v Connecticut Gen.Life Ins. Co., 924 F2d 698, 700-01 (7th Cir. 1991) (same); Misic v Building Service Employees Health & Welfare Trust, 789 F2d 1374, 1377-78 (9th Cir. 1986) (same); Cagle v Bruner, 921 F Supp 726, 735 (M.D. Fla. 1995) (same); Protocare of Metro. N.Y. v Mutual Ass'n Adm'rs , 866 F Supp. 757, 760-61 (S.D.N.Y. 1994) (same); and Washington Hasp. Center Corp. v Group Hospitalization & Medical Services, Inc., 758 F. Supp. 750, 752 (D.D.C. 1991) (same).

Moreover, where an ERISA plan initially ratifies an assignment by making medical benefits payments directly to the assignee, and only objects to the assignment when a coverage dispute results in litigation, even a clear anti-assignment provision is unenforceable. See, e.g., Hermann Hosp., 959 F.2d at 574.[5]

Applying these principles to facts in this case, and assuming arguendo that the final sentence of the paragraph labeled "assignment" (rather than "anti-assignment") otherwise amounted to an

---

[5]Although recognizing that unpublished decisions have no precedential value, the undersigned notes that in an unpublished decision, where an ERISA plan did not object initially to an assignment, but instead made payments to the assignee, the Fourth Circuit permitted the assignee to "stand in the shoes" of the insured and enforce the insured's ERISA rights notwithstanding an otherwise valid anti-assignment provision. Yarde v. Pan American Insurance Co., 67 F.3d 298 (table) (4th Cir. 2005).

anti-assignment provision, the Defendants may not rely upon it to avoid liability to BMA. Indeed, although the de facto assignment was not formalized until later, throughout their course of dealing with BMA and Mr. Leggette, the Defendants paid BMA's claims for benefits (until the Defendants determined that coverage limits had been reached), received and responded to BMA's appeals of the disputed coverage decisions, and otherwise treated BMA as a real party in interest. Accordingly, BMA has standing to pursue the ERISA claim discussed below.

## 2. __Denial of Health Insurance Benefits__

In determining the applicable standard of review of an ERISA fiduciary's decisions, the Supreme Court has held that "a denial of benefits challenged under [ERISA] is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 111 (1989). Accord Rego v. Westvaco Corporation, 319 F.3d 140, 146 (4th Cir. 2003) (if administrator does not act within scope of discretion conferred, then review is de novo). When an employee benefit plan gives a neutral plan administrator discretion to interpret the language of the plan, the administrator's determinations are ordinarily entitled to deferential review under an "abuse of discretion standard." Firestone Tire & Rubber Co., 489 U.S. at 115. Accord Colucci v. Agfa Corp. Severance Pay Plan, 431 F.3d.170, 176-77 (4th Cir. 2005); and Aliff v. BP America, Inc., 26 F.3d 486, 489 (4th Cir. 1994).

However, when the fiduciary has a potential conflict of interest–because it is both the payer of benefits and the decision maker–the district courts must apply what has been termed the "modified abuse of discretion" standard. Under that standard, the presence of a potential conflict is only one factor considered in assessing the primary inquiry, namely the "reasonableness" of the

decision.  <u>Bernstein</u>, 70 F.3d at 788.

Thus, where one interpretation of the plan in question will further the financial interests of the fiduciary, the Court's deferential standard must "be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict." <u>Bedrick v. Travelers Insurance Co.</u>, 93 F.3d 149, 152 (4th Cir. 1996).  <u>Accord</u>  <u>Booth v. Wal-Mart Stores, Inc., Associated Health and Welfare Plan</u>, 201 F.3d 335, 343 (4th Cir. 2000) ("fiduciary's conflict of interest, in addition to serving as a factor in the reasonableness inquiry, may operate to reduce the deference given to a discretionary decision of that fiduciary"); <u>and</u> <u>Doe v. Group Hospitalization</u>, 3 F.3d 80, 87 (4th Cir. 1993).  In other words, the administrator's decision to deny coverage must be reviewed to determine "whether it is consistent with an exercise of discretion by a fiduciary acting free of the interests that conflict with those of the beneficiaries." <u>Bedrick</u>, 93 F.3d at 152.

Since Hedrick is granted full discretionary authority to interpret the Plan, but also has considerable pecuniary interest (because Hedrick would be obligated to make benefit payments on any approved medical claims), the "modified abuse of discretion" standard applies in this case. Under that test, the administrator's decision is reasonable "if it is the result of a deliberate, principled reasoning process and it is supported by substantial evidence." <u>Bernstein</u>, 70 F.3d at 788, <u>quoting</u> <u>Baker v. United Mine Workers of Am. Health & Retirement Funds</u>, 929 F.2d 1140, 1144 (6th Cir. 1991).

In <u>Booth</u>, <u>supra</u>, the Fourth Circuit Court of Appeals stated that when determining whether a plan administrator's decision to terminate or deny benefits is reasonable and based upon substantial evidence, several factors are to be considered, including but not limited to:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they

support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

201 F.3d at 342-43.  Accord  Colucci, 431 F.3d. at 178-80 (applying Booth factors).

It is well settled, however, that "even as an ERISA plan confers discretion on its administrator to interpret the plan, the administrator is not free to alter the terms of the plan or to construe unambiguous terms other than as written."  Id. at 174, citing Kress v. Food Employers Labor Relations Ass'n, 391 F.3d 563, 569 (4th Cir.2004) (noting that courts are bound to enforce contractual provisions "as drafted").  Rather, "interpretive discretion only allows an administrator to resolve ambiguity."  Id.

Finally, ERISA does not contain an express exhaustion requirement, permitting covered employee benefit plans to require administrative remedies only if certain procedural safeguards are met.  Accord 29 C.F.R. 2560.503-1(f) (denial of benefits must be communicated to beneficiary in writing that contains, among other things, procedure and deadlines for administrative appeal); and Gayle v. United Parcel Service, 401 F. 3d 222, 224-25 (4th Cir. 2005) (failure to exhaust only a bar where denial decision contained required notice of appeals process).[6]

---

[6]29 C.F.R. § 2560.503-1(f) states in relevant part:

(f) Content of Notice. A plan administrator ... insurance company, insurance service, or other similar organization shall provide to every claimant who is denied a claim for benefits written notice setting forth in a manner calculated to be understood by the claimant:  (1) The specific reason or reasons for the denial; (2) Specific reference to the pertinent plan provisions on  which the denial is based; (3) A description of any additional materials or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and (4) Appropriate information as to the steps to be taken if the participant or beneficiary wishes to submit his or her claim for review.

Applying these legal principles to the record in this case again taken in the light most favorable to the Defendants – and taking into account both Hedrick's discretion to make coverage decisions and conflict of interest as joint decision maker and payer – neither its decision to pay for Mr. Leggette's dialysis treatment at the reduced 60% "out of network" rate nor to impose the $150,000 "out of network hospital" maximum were reasonable. Indeed, there is nothing in the record to indicate that Hedrick exercised its discretion in a deliberate or principled manner or that the disputed decisions were supported by any, much less "substantial" evidence. Accord Bernstein, 70 F.3d at 788 (administrator's decision reasonable "if it is the result of a deliberate, principled reasoning process and it is supported by substantial evidence").

As an initial matter, the Court will consider the Defendants' contention that the Plaintiffs failed to follow the administrative appeals process spelled out in the Plan document by not appealing PPI's April 15, 2002 denial to Hedrick within 60 days. Much to the contrary, the record is clear that in addition to lodging numerous informal complaints, BMA appealed three times in writing, that is, PPI responded to BMA's September 17, 2001, April 10, 2002, and May 15, 2003 letters with written decisions labeled "Response to Appeal" in the first two instances, and "Final Appeal Response" in the latter. At no time during this process did any Defendant inform the Plaintiffs of the 60 day deadline, as they were required to do under ERISA if the Defendants intended to enforce that Plan provision. Moreover, although Hedrick now denies that it had any knowledge of the dispute prior to receiving the May 15, 2003 letter, it is undisputed that on August 9, 2002, Hedrick wrote BMA that there would be no further payments from the Plan which only "cover[ed] $150,000.00 maximum for a non-preferred hospital – we have met that please do no re-bill us."

In short, despite not giving the Plaintiffs the required notices, very soon after PPI denied the

Plaintiffs' second appeal, Hedrick was somehow made aware of and ratified PPI's earlier conclusions.  Consequently, Hedrick's subsequent, self-serving refusal to consider the Plaintiff's final appeal solely on the grounds of untimeliness was manifestly unreasonable and was not otherwise supported by the record.   Accord 29 C.F.R. 2560.503-1(f); and Gayle, 401 F. 3d at 224-25.

Turning then to the underlying decisions that sharply limited the health care benefits available to Mr. Leggette, the administrative record reveals no reasoning process behind the determination that Mr. Leggette's dialysis treatment were reimbursable only at the "out of network" rate. The record contains no citations to the Plan supporting an out of network decision and no rationale for ignoring the repeated notations by the PPI employee ("Tami") responsible for responding to BMA's appeals that where no in network provider was available, reimbursement was customarily paid to out of network providers at the "in network" rate.  Moreover, PPI ultimately abandoned its initial position and its counsel, Ms. Flynn, informed Hedrick that the in network rate should apply.  Nevertheless, without supplying any justification, Hedrick elected to stand on the earlier "out of network" decision.

Even less defensible was the Defendants' determination that BMA was a "hospital," notwithstanding an  unambiguous definition of that term in the Plan document, quoted above, that BMA clearly did not match.  Indeed, BMA did not provide in patient services with round-the-clock nursing care, nor had it been recognized as a "hospital" by the Joint Commission on Accreditation of Hospitals, all mandatory requirements for hospital status under the Plan.  Although the Defendants belatedly point to BMA's use of UB-92 forms as possibly explaining PPI's initial conclusion, the record does not show that the use of a particular form actually influenced the

decision making process and, in any event, BMA used the UB-92 form at PPI's suggestion. Additionally, PPI <u>reversed</u> its earlier decision in this regard, with Ms. Flynn going so far as to characterize the decision to label BMA a hospital (thereby limiting Mr. Leggette's dialysis coverage to $150,000, rather than the $1 million cap that otherwise would have applied), as "arbitrary and capricious."

In other words, rather than making reasoned decisions that were supported by substantial evidence, Hedrick abused its discretion when it limited Mr. Leggette's healthcare benefits as discussed above. <u>Accord</u> <u>Colucci</u>, 431 F.3d. at 178-80; <u>Booth</u>, 201 F.3d at 343; <u>and</u> <u>Bedrick</u>, 93 F.3d at 152. The Plaintiffs' Motion for Summary Judgment will, therefore, be <u>granted</u> as to the Hedrick Defendants' liability on the Plaintiffs' ERISA denial of benefits claim. For the same reasons, the Hedrick Defendants' Motion for Summary will be <u>denied</u> as to that claim.

### C. **Medicare Secondary Payer Act Claim**

In 1981, Congress enacted the Medicare Secondary Payer Act ("MSP"), 42 U.S.C. § 1395y(b)(2), in response to the "skyrocketing" cost of Medicare in order to "reduce federal spending and to protect the financial well being of the Medicare program." <u>United States v. Travelers Insurance Co.</u>, 815 F. Supp. 521, 522 (D. Conn. 1992). The provisions were enacted to lower overall federal Medicare disbursements by requiring Medicare beneficiaries to exhaust all available private insurance coverage before resorting to their Medicare coverage to cover their medical expenses. <u>See</u> <u>United States v. Rhode Island Insurers' Insolvency Fund</u>, 80 F.3d 616, 618 (1st Cir. 1996); <u>and</u> <u>Brown v. Thompson</u>, 252 F. Supp. 2d 312 (E.D. Va. 2003). In other words, usually (and as the parties agree is this case here) the private insurer has "primary" responsibility to make  payments to the limits of existing coverage, and Medicare's coverage is secondary. 42

U.S.C. § 1395y(b)(2)(A).

The MSP also establishes a private cause of action "for double damages against a primary plan which fails to provide for primary payment." 42 U.S.C. § 1395y(b)(3). Although there is no binding authority on point, the few courts to consider the issue have held that a MSP "double damages" claim may be maintained only where Medicare has, in fact, paid claims that a primary insurer should have, but refused, to pay. See, e.g., Manning v. Utilities Mut. Ins. Co., Inc., 254 F.3d 387, 391-92 (2nd Cir. 2001) ("Congress has authorized a private cause of action and double damages against entities designated as primary payers that fail to pay for medical costs for which they were responsible, which are borne in fact by Medicare") (emphasis added); and Framer v. CNA Ins. Co., 374 F.Supp.2d 1067, 1077 (N.D.Ala. 2005) ("consensus of reported cases" is that private cause of action may be maintained and double damages recovered against primary payers failing to pay for medical costs for which they are responsible only to extent those costs "in fact" paid by Medicare).

The requirement of actual payment by Medicare as a prerequisite to maintaining a double damages action is clearly supported by the MSP's express provision that in every case where a private plaintiff successfully recovers against a private insurer, the United States is entitled to recover from the plaintiff all amounts actually paid by Medicare. 42 U.S.C. § 1395y(b)(2)(B)(ii) & (iii) (establishing government's rights to subrogation). Moreover, absent submission of the claims to and payment of at least some portion of them by Medicare, it is impossible to calculate the amount of damages subject to doubling, because clearly the baseline for double damages is not the amount billed by the provider, but the damages Medicare actually incurred as a result of the primary plan's failure to pay. 42 U.S.C. § 1395y(b)(3)(A).

19

Applying these principles to the facts in this case, where none of the disputed unpaid claims were submitted to Medicare, the Plaintiffs may not maintain a private right of action pursuant to the Medicare Secondary Payers Act. Accord Manning, 254 F.3d at 391-92; and Framer, 374 F.Supp.2d at 1077. Therefore, the Hedrick Defendants' Motion for Summary Judgment will be granted as to the Plaintiffs' MSP claim.

## III. ORDER

**NOW THEREFORE, IT IS ORDERED:**

1. Defendant Primary Physiciancare Inc.'s "Motion to Dismiss or, in the Alternative, for Summary Judgment" (document #39) is **GRANTED**, and the Plaintiffs' ERISA claims are **DISMISSED WITH PREJUDICE** as to this Defendant only.

2. The "Plaintiffs' Motion to Strike the Declaration of Joanne Johnson" (document #51) is **DENIED**.

3. "Defendants B.V. Hedrick Gravel and Sand Company and Hedrick Employee Group Benefit Plan 1's Motion for Summary Judgment" (document #46) is **GRANTED IN PART** and **DENIED IN PART**, that is, the Plaintiffs' claim under the Medicare Secondary Payers Act is **DISMISSED WITH PREJUDICE**, and those Defendants' Motion for Summary Judgment is **DENIED** in all other respects.

4. The "Plaintiffs' Motion for Summary Judgment" (document #44) is **GRANTED IN PART** and **DENIED IN PART**, that is, **GRANTED** as to the Defendants' B.V. Hedrick Gravel and Sand Company and Hedrick Employee Group Benefit Plan 1's liability on the Plaintiffs' ERISA denial of benefits claim, but is **DENIED** as to the Plaintiffs' Medicare Secondary Payers Act claim, dismissed above.

5.    The Clerk is directed to place the remaining issue in this case (the amount of the Plaintiffs' damages on their remaining ERISA claim, including recovery of attorneys' fees and costs) on the calendar for trial during the Court's September 18, 2006 Civil Term for a bench trial.

6.    Counsel for the parties are encouraged to explore settlement in light of the Court's rulings herein, and to consider whether returning to the previously-ordered mediation might be advisable.  Provided, however, counsel are advised that the Court intends to try this case during its September Term and therefore any efforts to settle their differences in the interim should be promptly commenced.

7.    The Clerk is directed to send copies of this Memorandum and Order to counsel for the parties.

**SO ORDERED, ADJUDGED, AND DECREED**.

Signed: May 24, 2006

_Carl Horn, III_

Carl Horn, III
United States Magistrate Judge